UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JILLIAN BECCIA,

      Plaintiff,

                             Case No. 23-cv-13027

v.                               Honorable Linda V. Parker

GOODRICH AREA SCHOOL DISTRICT,

      Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 16)

On November 29, 2023, Plaintiff Jillian Beccia filed this lawsuit against her former employer, Defendant Goodrich Area School District ("District"), claiming that the District violated federal and state law by failing to provide reasonable accommodations for her medical conditions and retaliating against her for protected activity. Specifically, in her Complaint, Ms. Beccia alleges: (a) disability discrimination in violation of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973, and Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA"), and (b) retaliation in violation of the ADA. (ECF No. 1.)

The matter is presently before the Court on the District's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c), which is fully briefed. (ECF Nos. 16-18.) Finding the facts and legal arguments adequately

presented in the parties' briefs, the Court is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).  For the reasons set forth below, the Court is granting the District's motion.

## I.     Summary Judgment Standard

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Id*. at 323.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  To demonstrate a genuine issue, the nonmoving party must present sufficient evidence

2

upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient.  *See Liberty Lobby*, 477 U.S. at 252.  The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor.  *See Liberty Lobby*, 477 U.S. at 255.

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by[] citing to particular parts of materials in the record . . .."  Fed. R. Civ. P. 56(c)(1).  The parties must designate with specificity the portions of the record such that the court can "readily identify the facts upon which [each] . . . party relies[.]"  *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied* 494 U.S. 1091 (1990).  It is not the court's responsibility to construct a party's argument from the record or search out facts from the record supporting those arguments.  *See, e.g., Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)) ("the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact"); *see also InterRoyal Corp.*, 889 F.2d at 111 ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim.").

## II.    Factual Background

From 2005 through 2022, Ms. Beccia worked in various teaching positions at one of the District's elementary schools.  (ECF No. 16-2 at PageID.146.)  In 2018, she was diagnosed with Still's disease, an inflammatory condition, and Hashimoto's disease, an autoimmune disorder.  (*Id*. at PageID.147, 150.)  Ms. Beccia informed the District of her conditions in February 2020, when she requested intermittent leave under the Family Medical Leave Act ("FMLA").  (*Id*. at PageID.148, 151; ECF No. 16-4.)  The District always approved Ms. Beccia's FMLA leave requests.  (ECF No. 16-2 at PageID.149.)

At the start of the 2019-2020 school year, Ms. Beccia was assigned to a Kindergarten class.  (*Id*. at PageID.151.)  When the COVID-19 pandemic hit in March 2020, the District went virtual for the remainder of the school year.  (*Id.* at PageID.153.)  Some staff and students returned to the classroom for the 2020-2021 school year; however, the District allowed Ms. Beccia to continue working remotely based on medical documentation supporting her need to do so.  (*Id*. at PageID.153-54.)  Ms. Beccia taught students remotely at three grade levels: Developmental Kindergarten ("DK"), Kindergarten, and First Grade.

The District returned to full in-person learning at the start of the 2021-2022 school year.  (ECF No. 16-2 at PageID.155.)  Ms. Beccia was assigned a Kindergarten classroom.  (*See* ECF No. 1-3 at PageID.20.)  In January 2022, she

4

requested the following accommodations from the District due to her medical

conditions:

> (1)  Unimpeded access to and use of personal medical
> equipment and medications;
>
> (2)  Indoor masking, social distancing, and quarantine
> compliance in accordance with local and state guidelines
> at the time; and
>
> (3)  Proper and consistent cleaning by environmental
> services or other staff tasked with disinfecting the
> classroom.[1]

(ECF No. 16-2 at PageID.157-59; ECF No. 17 at PageID.329.)  There is no dispute

that the District granted Ms. Beccia's requested accommodations.[2]  (ECF No. 16-2

at PageID.167.)  The District also agreed to provide Ms. Beccia an alternative

setting when there were large or mass gatherings (e.g., professional development

activities or school assemblies) and granted her continued request for FMLA leave.

(ECF No. 16-2 at PageID.159; ECF Nos. 16-7 to 16-9, 16-20.)

---

[1] In her response brief, Ms. Beccia states that she "felt she was entitled to more
accommodations" (ECF No. 17 at PageID.330); however, she never identifies what
those additional accommodations were or, more importantly, that she ever asked
the District to provide them.

[2] The granted accommodations are worded somewhat differently than what is set
forth *supra*; however, they are substantively the same.  (*See* ECF No. 17-2 at
PageID.344)

In connection with the third accommodation—cleaning and disinfecting her classroom—the District's Superintendent informed Ms. Beccia that there was a checklist detailing how and what needed to be cleaned in her room, which the cleaning staff had to complete, initial, and date.  (ECF No. 17 at PageID.330.) Completed checklists reflect the various tasks taken to clean Ms. Beccia's classroom on a daily basis in March through June 2022, with the exception of school closures and one date when the custodian was absent due to illness.[3]  (ECF No. 16-10; ECF No. 16-2 at PageID.183-84.)  Ms. Beccia nevertheless provides evidence of deficiencies or oversights in the cleaning.

Specifically, on what Ms. Beccia states was February 11, 2022, she noted popcorn and crayons not being swept up and "some squished snack item" left on the floor.[4]  (ECF No. 17-5.)  She describes the floor as "pretty disgusting."  (*Id.*) On Thursday March 3, she found "raisins smashed into the floor, stickiness . . .." (ECF No. 17-6.)  The following day, the same raisins were still on the floor.  (ECF

---

[3] On April 11, 2022, Ms. Beccia's classroom was not vacuumed, but that was at her request.  (ECF No. 16-2 at PageID.183.)

[4] Exhibits 5-9 to Ms. Beccia's response brief are "transcripts" of videos.  (*See* ECF Nos. 17-5 to 17-9; ECF No. 17-19.)  Ms. Beccia has not placed the actual videos into the record.  The transcripts contain a different date and time at the top than when Ms. Beccia states they are being recorded.  (*See id.*)  For example, the transcription for the first video indicates that it is from "the morning of February 11th[,]" but a note at the top reads: "Mon, 11/25 16:27 PM ·1mins[.]"  (ECF No. 17-9 at PageID.358.)

No. 17-7.)  They were still there Monday morning.  (ECF. No. 17-8.)  In another transcript, for which Ms. Beccia does not state a date, she notes that food from the day before had not been swept up.  (ECF No. 17-9.)  According to Ms. Beccia, "[t]his was a pretty constant reoccurrence."  (ECF No. 16-2 at PageID.168.)

Nevertheless, Ms. Beccia acknowledged during her deposition in this matter that the food remnants she found on her classroom floor did not necessarily indicate that the room had not been otherwise cleaned and disinfected.  (*Id.* at PageID.169-70.)  She conceded that she did not know how frequently her classroom floor was mopped, and that it could have been daily.  (*Id.* at PageID.179.)  Ms. Beccia did not stay after school to observe whether her room was being cleaned, and she did not ask anyone to do so for her.  (*Id.* at PageID.184.)

Ms. Beccia told "Ashley," her lawyer, about the food remnants left on her classroom floor.  (*Id.* at PageID.168.)  But she did not tell anyone at the District and is unaware of whether her lawyer communicated the information to the District.  (*See id.* at PageID.168-69, 173.)  There is no evidence that Ms. Beccia reported to the District that her room was not being cleaned and disinfected in accordance with her accommodations. [5]

---

[5] Ms. Beccia claims in her response brief that she "informed Defendant that her room was not being cleaned in accordance with her disability accommodations." (Cont'd . . .)

7

Other teachers in the building complained at a staff meeting in February about the building's general cleanliness, but Ms. Beccia did not raise a concern about her room specifically.[6] (*Id.* at PageID.169, 171-73.) It was not until the end of the school year that Ms. Beccia reported any concern about the cleaning of her classroom, but that report was to the union president and relayed only the request Ms. Beccia received from a member of the cleaning staff to mop once a week. (*Id.* at PageID.178-79.)

---

(ECF No. 17 at PageID.331.) She further states that she "documented the condition of the room to engage in problem solving discussions with her administrators and union representative" and that "[t]hose individual remained uninterested in assisting her." (*Id.*) Later, she asserts that "[i]n March, April, and May 2022, [she] continued to try to resolve these issues, but they were ignored by school administrators. (*Id*. at PageID.336 (citing ECF Nos. 17-5 to 17-9).) However, Ms. Beccia either cites no record evidence to support these assertions or the cited evidence is not supportive. For example, she cites to the video transcripts. (*Id.*) But these transcripts do not reflect that Ms. Beccia reported the observations being described to anyone. And Ms. Beccia testified that she did not share the videos with anyone from the District. (ECF No. 16-2 at PageID.180-81.)

 Ms. Beccia points out that she filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on February 11, 2022, in which she asserted that her "classroom consistently remained dirty, without being properly cleaned or disinfected in an appropriate manner." (ECF No. 17 at PageID.336 (citing ECF No. 17).) The complaint is signed and dated February 11, 2022. However, Ms. Beccia offers no evidence as to when *the District* received notice of her complaint. The District's evidence reflects that it received the complaint only on July 10, 2023. (*See* ECF No. 18-2.)

[6] Ms. Beccia did ask "if the cleaning staff had a checklist for *each* room to follow," and was told no. (ECF No. 16-2 at PageID.173 (emphasis added).) To the extent Ms. Beccia argues otherwise, this fails to show that there was not a checklist for her room.

Ms. Beccia claims the District also failed to adhere to her accommodations because paper towels were not provided in her classroom on February 16 and 22, 2022, which allegedly interfered with her students' ability to properly wash their hands as recommended by CDC guidelines.  (ECF No. 17 at PageID.335-36.)  However, on those dates, Ms. Beccia had paper towels donated by parents in the classroom cabinet.  (ECF No. 16-2 at PageID.177.)  There also was a bathroom, which Ms. Beccia's classroom shared with another class, with a sink and paper towels her students could use on the dates her classroom sink was allegedly without paper towel.  (*Id*. at PageID.175-76.)

The District's 2022-2023 school year began on Thursday, September 1, with Ms. Beccia assigned to the DK classroom.  (ECF No. 16-21; ECF No. 1 at 186.)  However, Ms. Beccia tested positive for COVID-19, requiring her to quarantine from Tuesday, September 6 until Friday, September 9.  (ECF No. 16-9; ECF No. 16-2 at PageID.185.)  On September 7, while Ms. Beccia was on leave, the school principal, Kate Jordan, sent her an email, indicating that a student with behavioral issues was "in need of DK" and would be assigned to her classroom beginning on Monday.  (ECF No. 16-2 at PageID.186-87; ECF No. 17-11 at PageID.366.)

Two spots were open in Ms. Beccia's classroom to accommodate Kindergarten students who needed to move down to DK.  (*Id*.)  In her email to Ms. Beccia concerning this particular student, Ms. Jordan shared:  "After collecting

9

data, classroom observations with GSRP [Great Start Readiness Program] teachers and parents, we are confident that this is the right placement for [the student]." (ECF No. 17-11 at PageID.366.)  Ms. Jordan further conveyed that the student's current teacher "has worked to put some systems in place (visual schedule, sensory spot) that will transition with [the student] to [Ms. Beccia's] classroom" and that the resource room teacher would support the student and Ms. Beccia during the student's first week in DK.  (*Id.*)  Ms. Beccia opposed the decision to move the student to her classroom.  (*Id.* at PageID.365-66.)  Ms. Jordan responded that "the decision has been made[.]"  (*Id.* at PageID.365.)

Ms. Beccia returned to work on Monday, September 12, the student's first full day in her classroom.  (*See* ECF No. 16-2 at PageID.187.)  However, the following day, Ms. Beccia went on FMLA leave with an expected return date of October 22.  (ECF No. 16-9 at PageID.239; ECF No. 16-11.)  Instead, on October 7, Ms. Beccia sent a resignation letter to the District.  (ECF No. 16-16.)  She stated in the letter that she had experienced retaliation after requesting her accommodations and that "the few accommodations that were approved in writing[] were not implemented by the district."  (*Id.*)

III.    **Applicable Law and Analysis**

A.    **Disability Discrimination**

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . [the] terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Discrimination, as defined by the statute, includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  *Id.* § 12112(b)(5)(A).  The ADA further defines "reasonable accommodations" to include, among other things, "making existing facilities used by employees readily accessible to and usable by individuals with disabilities[.]"  *Id.* § 12111(9)(A).

The PWDCRA and Rehabilitation Act similarly prohibit discrimination.  *See* 29 U.S.C. § 794; Mich. Comp. Laws § 37.1102 *et seq.*  "The PWDCRA 'substantially mirrors' the ADA, and a resolution of [a plaintiff's] ADA claims will 'generally, though not always, resolve the plaintiff's PWDCRA claim."  *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023) (citations omitted).  The ADA and Rehabilitation Act "materially differ[] in only two ways" and are generally analyzed together.  *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 323-24 (6th Cir. 2023) (citations omitted).  The only distinction between the federal statutes that is relevant here is that "the Rehabilitation Act requires that discrimination occur 'solely by reason of' the plaintiff's disability, whereas the ADA requires that it

11

occur 'because of' the plaintiff's disability." *Id.* at 324 (citing *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315 (6th Cir. 2012) (en banc)).

A plaintiff can prove discrimination under these statutes in two ways, either directly or indirectly. *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022) (citing *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018)). "[C]laims *premised* upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Id*. (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007)). Under the direct evidence test, the plaintiff must show that she is disabled and "otherwise qualified" for the position despite her disability: "(a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Kleiber*, 485 F.3d at 869 (quoting *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 452 (6th Cir.), *cert. denied*, 543 U.S. 817 (2004)). The defendant must then show "that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer." *Id*. (quoting *Hedrick*, 355 F.3d at 452).

The current lawsuit presents an unusual scenario, as there is no dispute that Ms. Beccia is disabled and otherwise qualified for her position despite her disability with the proposed accommodations, and that the District agreed to

12

provide Ms. Beccia with her *requested* accommodations.[7] The parties' dispute

centers around whether the District in fact implemented the accommodations it

agreed to provide.

In her response brief, Ms. Beccia maintains that the District failed to

implement two of the agreed-upon accommodations: (1) following Genesee

County Health Department Guidelines regarding quarantines and (2) maintaining a

properly and thoroughly disinfected, clean classroom environment.[8] (*See* ECF No.

17 at PageID.335-36.) The first alleged deficiency relates to the failure to

quarantine Ms. Beccia's students who had come in contact with a Reading

Specialist and teacher who had contracted COVID-19. (*See id.* at PageID.336.)

However, Ms. Beccia offers no details concerning either incident to enable

the fact finder to conclude that some unspecified health department guideline was

---

[7] As noted earlier, Ms. Beccia states in her response brief that she "felt she was entitled to more accommodations." (ECF No. 17 at PageID.330.) In addition to citing no record evidence to support this assertion, Ms. Beccia does not identify those additional accommodations or, more significantly, claim that she informed the District of her need for them. "A disabled employee who claims that he or she is otherwise qualified with a reasonable accommodation bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Tubbs v. Formica Corp.*, 107 F. App'x 485, 488 (6th Cir. 2004) (quoting *Cassidy v. Detroit Edison Co.*, 138 F.3 629, 633-34 (6th Cir. 1998)) (internal quotation marks and additional citation omitted).

[8] Ms. Beccia also asserts that "an unreasonable delay in the processing of an accommodation request violates the ADA." (ECF No. 17 at PageID.336 (collecting cases).) However, she has not identified any delay in this case.

not followed.  For example, she does not offer evidence to show that any exposed student met the health department's criteria for quarantine.  (*See* ECF No. 16-5 at PageID.212-13.)  Moreover, Ms. Beccia could not recall at her deposition when staff members contracted COVID-19 (*see* ECF No. 16-2 at PageID.166), and she has not otherwise offered evidence to show that it happened after she requested and was granted accommodations.

Thus, Ms. Beccia presents insufficient evidence from which a jury could legitimately infer that the District failed to implement the accommodation requiring its compliance with local and state COVID-19 guidelines.  She also fails to create a jury question as to whether the District failed to implement the cleaning requirement.

In her response brief, Ms. Beccia relies on two conditions to make this showing: (1) the presence of food debris on her classroom floor, and (2) the occasional absence of paper towels at the in-classroom sink.  (*See* ECF No. 17 at PageID.335-336.)  When asked at her deposition how the paper towel related to her accommodations, Ms. Beccia "assume[d]" it was part of the District's obligation "[t]o follow Genesee County Health Department Guidelines and to be able to disinfect."  (ECF No. 16-2 at PageID.176.)  However, the agreed-to accommodations required the District to follow the county's guidelines "*regarding*

14

*quarantines*," not all COVD-related guidelines. [9]  The accommodations also

provided for the cleaning and disinfection of Ms. Beccia's *classroom*, but her

deposition testimony reflects her belief that the paper towel was necessary only as

part of handwashing.  (*Id.*)  She conceded, however, that the soap and water are the

disinfectants.  (*Id.*)  Ms. Beccia acknowledged at her deposition that any lack of

paper towels is irrelevant to the cleaning of her classroom.  (*Id.*)

With respect to the food debris, Ms. Beccia acknowledged that finding food

on the floor did not mean that the door handles, light switches, desks, and chairs

had not been wiped down or that disinfectant had not been sprayed.  (*Id.* at

PageID.169-70.)  Checklists completed by custodial staff show that Ms. Beccia's

classroom was cleaned and disinfected daily, with the exception of days when

school was not in session and a day when the custodian was out sick.  Ms. Beccia

agreed at her deposition that the completed checklists reflected that her classroom

had been cleaned and disinfected despite the food remnants she found afterward.

(*Id.* at PageID.182.)  But even if a jury could reasonably infer that Ms. Beccia's

classroom was not properly cleaned the night before she found food on the floor,

---

[9] In any event, Ms. Beccia's testimony reflects that paper towels were always available for her and her students after washing their hands.  The classroom was stocked with hand soap and disinfectant, including Lysol or Clorox wipes which students used to clean their desks. (ECF. No. 16-2 at PageID.170, 175-76.) Further, donated paper towel and paper towel at the sink in the shared bathroom were available.  (*Id.*)

food remnants found on five days over an approximate three-month time period do not show that the District did not reasonably accommodate Ms. Beccia's medical needs. *See Keller v. Chippewa Cnty., Mich. Bd. of Comm'rs*, 860 F. App'x 381, 387 (6th Cir. 2021) (citing *Wright v. N.Y. State Dep't of Corr.*, 831 F.2d 64, 72 (explaining that a reasonable accommodation "need not be 'perfect'"); *Wright*, 831 F.2d at 72 (quoting *Dean v. Univ. at Buffalo Sch. of Med. & Biomed. Sciences*, 804 F.3d 178, 189 (2d Cir. 2015)) ("The hallmark of a reasonable accommodation is effectiveness."). Nor is an issue of fact established by an unidentified cleaning employee's alleged lack of knowledge of any disinfecting or cleaning checklist for Ms. Beccia's classroom (*see* ECF No. 17 at PageID.331), particularly where completed cleaning checklists for her classroom are in the record, the validity of which Ms. Beccia has not contested.

Moreover, the law imposes a duty on both parties—an employee seeking a disability accommodation and the employer—to engage in the interactive accommodation process "in good faith." *Kleiber*, 485 F.3d at 871. If Ms. Beccia believed her classroom was not being sufficiently cleaned by the District's custodial staff, she should have alerted school administrators. *See Peterson v. Capital One, N.A.*, 705 F. Supp.3d 484, 503 (D. Md. 2023) (relying on the "good faith" requirement in the interactive process, which is applicable to both sides, to find that "[a]n employee may not simply casually inform their employer about a

requested accommodation and bring suit when the accommodation is not performed exactly as they requested); *see also Young v. Cent. Square Cent. Sch. Dist.*, 213 F. Supp .2d 202, 213-214 (N.D.N.Y. 2002) ("If the interactive process breaks down, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. In this regard, failure to provide the information necessary to determine what accommodations can be provided may be the cause of the breakdown and the party withholding the information may be found to have obstructed the process.") (citations and internal quotation marks omitted). Throughout her response brief, Ms. Beccia asserts that she did. (*See* ECF No. 17 at PageID.331-32; *Id.* at PageID.336.) However, her assertion is not supported by the parts of the record she cites (i.e., the video transcripts and her EEOC complaint)—when evidence is cited.[10] (*See id.*) As indicated earlier, there is no evidence that Ms. Beccia shared the videos with any District employee or administrator, and the record reflects that the District received

---

[10] As pointed out elsewhere, Ms. Beccia makes numerous factual assertions in her response brief for which no record evidence is cited in support. But a party claiming that a fact is genuinely disputed must support the assertion with evidence and cite to the evidence, not leave the court and opposing party to search out the facts from the record. Fed. R. Civ. P. 56(c)(1); *Street*, 886 F.2d at 1479-80 (citing *Frito-Lay, Inc.*, 863 F.2d at 1034); *see also InterRoyal Corp.*, 889 F.2d at 111.

notice of the EEOC complaint only on July 10, 2023—*nine months after Plaintiff resigned*.

For these reasons, Ms. Beccia fails to demonstrate a genuine issue for trial with respect to her claim that the District failed to provide her with reasonable accommodations.  The District is, therefore, entitled to summary judgment on her disability discrimination claims under the ADA, Rehabilitation Act, and PWDCRA.

### B.   Retaliation

Under the ADA's retaliation provision, it is unlawful to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) she engaged in activity protected by the statute; (2) the employer knew of that activity; (3) the employer took an adverse action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse action.[11]  *Wyatt v. Nissan N.A., Inc.*,

---

[11] The need to establish a prima facie case arises where the plaintiff lacks direct evidence of retaliation.  *See Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014).  The District asserts that there is no direct evidence of retaliation.  (ECF No. 16 at PageID.125.)  Ms. Beccia appears to concede this point, as she proceeds (Cont'd . . .)

999 F.3d 400, 419 (6th Cir. 2021) (citations omitted).  The District argues that there is no evidence to support the third and fourth elements of Ms. Beccia's prima facie case.

### 1.    Adverse Action

The District maintains that Ms. Beccia did not suffer an adverse action to support her retaliation claim, relying primarily on its argument with respect to her discrimination claim.  (ECF No. 16 at PageID.125.)  However, the two claims "are not coterminous." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (holding that adverse actions for purposes of substantive discrimination and retaliation "are not coterminous").

"In the retaliation context, the term 'adverse employment action' encompasses more than just actions that affect 'the terms, conditions[,] or status of employment.'" *Wyatt*, 999 F.3d at 419 (quoting *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 345 (6th Cir. 2008)).  A plaintiff claiming retaliation "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68 (internal quotation marks and citations omitted); *see also Wyatt*, 999 F.3d at 419 (quoting *Hawkins*, 517 F.3d at 345).  The Supreme Court explained in *White* that it

---

directly to the elements of her prima facie case.  (*See* ECF No. 17 at PageID.337.)

"speak[s] of *material* adversity because . . . it is important to separate significant from trivial harms."  548 U.S. at 68.  Whether an action is materially adverse is judged by an objective standard.  *Id*. ("We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective.").

Ms. Beccia claims that, in response to her accommodation requests and EEOC complaint, the District: (a) "placed additional barriers on [her] in the form of adding special needs students in her classroom without the required supports"; (b) decreased her performance review score without any appropriate explanation; and (c) forced her resignation due to its "failure to provide the accommodation it had agreed to in the prior school year, which continued into the following school year, and the hostility that [was] demonstrated towards her requests"—in other words, she was constructively discharged.[12]  (ECF No. 17 at PageID.338.)  The cited record evidence does not support these alleged adverse actions, however.

Beginning with Ms. Beccia's claim that the District "inundate[d] her with additional students with significant needs and refuse[d] to respond to her requests

---

[12] In her response brief, Ms. Beccia also states that she "experienced extreme hostility in the workplace" after requesting accommodations (ECF No. 17 at PageID.333), and she wrote in her resignation letter that she "experience[d] retaliation from [her] colleagues and the [D]istrict's administration (ECF No. 17-13).  Ms. Beccia does not elaborate on this "hostility" and "retaliation," aside from what is detailed above.  As discussed *infra*, she offers no evidence of "hostile" treatment by her colleagues.

on the students' behalf regarding services needed for these students." (ECF No. 17 at PageID.332 (citing ECF Nos. 17-10 & 17-11).) She claims that these students were assigned to her classroom without reasonable notice or planning and that the number of students with special needs assigned to her classroom was much higher than her colleagues. (*Id*. (citing ECF No. 17-18).) According to Ms. Beccia, other teachers "believed she was being sabotaged." (*Id*. (citing ECF Nos. 17-14 & 17-15).)

The evidence Ms. Beccia cites in support of these assertions relates primarily to the assignment of *a single* student to her classroom at the start of the 2022-2023 school year. Ms. Becca received notice of the placement several days before it occurred, and she fails to show that this was insufficient timing. Contrary to Ms. Beccia's claim, the record reflects that the decision was made after discussion and consideration by various staff members and the student's parents, and that resources were put in place to aid the student and Ms. Beccia in the transition. (*See* ECF No. 17-11 at PageID.366.) Notably, Ms. Beccia spent only one day in the classroom with this student before she took leave and then resigned.

None of the evidence Ms. Beccia cites reflects the opinion of any other teacher—or in fact anyone other than Ms. Beccia—that the District treated her differently than her colleagues or adversely. The letter she attaches from Erin Janetsky reflects only that Ms. Beccia was assigned students with "extreme issues"

21

and who were difficult to manage during the 2021-2022 school year; although, in Ms. Janetksy's opinion, Ms. Beccia is a capable and caring teacher who kept these students "on track for learning and growth." (ECF No. 17-14 at PageID.369.) More significantly, the letter does not suggest in any way that these students were moved to Ms. Beccia's classroom after she engaged in protected activity.

The email Ms. Beccia attaches to her response brief, where she charts—as the Court interprets it—the number of students assigned to each classroom, the number requiring social worker assistance, and the number requiring sensory breaks (*see* ECF No. 17-18 at PageID.377), also does not support that she was assigned more special needs students than her colleagues *after* she engaged in protected activity. The email is dated February 17, 2022, shortly after Ms. Beccia sought an accommodation. Like Ms. Janetsky's letter, it does not reflect when the students were assigned to Ms. Beccia's classroom. Therefore, there is no basis from which the trier of fact could conclude from this evidence that she was "inundated" with more students with special needs after she engaged in protected activity.

With respect to Ms. Beccia performance reviews, they do show her overall rating decreasing from 3.602 ("highly effective") for the 2020-2021 school year to

3.0 ("effective") for the 2021-2022 school year.[13]   (ECF No. 17-16.)  Even

assuming that the "effective" rating constitutes a "negative" performance

evaluation, she does not show that it is "materially" adverse—that is, it is not

"harmful to the point that [it] could well dissuade a reasonable worker from

making or supporting a charge of discrimination."  *White*, 548 U.S. at 57.  Ms.

Beccia offers no evidence to suggest that this slightly lower performance

evaluation threatened to "significantly impact [her] wages or professional

advancement."  *Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x 424, 433 (6th

Cir. 2007); *see also Lahar v. Oakland Cnty.*, 304 F. App'x 354, 357 (6th Cir. 2008)

(quoting *Halfacre*, 221 F. App'x at 433) (finding that the plaintiff's lower

evaluations were not adverse actions because she failed to show that they "affected

her wages or prospects for advancement"); *Cecil v. Louisville Water Co.*, 301 F.

App'x 490, 501 (6th Cir. 2008) (same); *but see Henry v. Abbott Labs.*, 651 F.

App'x 494, 505 (6th Cir. 2016) (finding that a "Partially Achieving Expectations"

("PA") evaluation, after routinely being rated as "Exceeding Expectations" and

"Achieving Expectations," was an adverse action where it was "undisputed" that

---

[13] The reviews appear to be based, at least in part, on objective criteria (i.e., the performance of the teacher's students on local and state testing), and it appears that Ms. Beccia's students during the 2021-2022 school year performed lower than her students in previous years.  (*See* ECF No. 17-16.)

"receiving a PA on an annual performance evaluation . . . renders an employee ineligible for a promotion and therefore affects her advancement potential").

As to Ms. Beccia's assertion that she was "constructively discharged," this requires evidence that: (1) the District "deliberately created working conditions that a reasonable person would perceive as intolerable"; (2) the District "did so to force [Ms. Beccia] to quit; and (3) Ms. Beccia quit. *Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 373 (6th Cir. 2024) (citing *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012)). "Constructive-discharge claims require courts to examine 'both the employer's intent and the employee's objective feelings.'" *Id.* (quoting *Savage*, 665 F.3d at 739). For the reasons discussed above, Ms. Beccia has not shown that the District deliberately created working conditions that a reasonable person would perceive to be intolerable. Nor does she offer evidence suggesting that the District intended Ms. Beccia to quit.

Instead, the evidence reflects that, aside from moving a single student from Kindergarten to Ms. Beccia's DK classroom, which she fought against, the District worked to accommodate Ms. Beccia's medical needs. It approved her for FMLA leave and granted her requests for accommodations.

Even if Ms. Beccia could satisfy the adverse-action element of her retaliation claim, she fails to establish a causal connection between her protected activity and the adverse actions alleged. First, the District only learned of Ms.

24

Beccia's EEOC complaint nine months after she resigned.  Therefore, there can be no causal connection between that protected activity and any of the alleged adverse actions.

Ms. Beccia's 2021-2022 school year evaluation is dated June 9, 2022—approximately five months after she requested accommodations.  (*See* ECF No. 17-16 at PageID.375.)  The addition of a special needs student to Ms. Beccia's DK classroom did not occur until the start of the 2022-2023 school year—at least seven months after her accommodations request.  (*See* ECF No. 17-11 at PageID.366.) These gaps in time are longer than those found sufficient to establish a causal connection in the cases Ms. Beccia cites: *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 563 (6th Cir. 2004) (holding that a time span of "just over three months" between the filing of the plaintiff's discrimination charge and termination was sufficient to infer a retaliatory motive); *Howington v. Quality Restaurant Concepts, LLC*, 298 F. App'x 436, 446 (6th Cir. 2008) (finding temporal proximity sufficient to establish a causal connection where the plaintiff was suspended two days after his protected activity).[14]

_____

[14] One district judge described *Singfield* as "an outlier[,]" as Sixth Circuit caselaw finds temporal proximity sufficient only when the protected conduct and adverse actions are "*extremely* close[.]"  *Ervin v. Honeywell Tech. Sol., Inc.*, No. 3:10-cv-1234, 2013 WL 594747, at *10 (M.D. Tenn. Feb. 15, 2013) (emphasis added); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that some cases have "accept[ed] mere temporal proximity between an employer's (Cont'd . . .)

As the Sixth Circuit explained in *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (2008), only "[w]here an adverse employment action occurs *very close* in time after an employer learns of a protected activity" is such temporal proximity "significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Id.* at 525 (emphasis added). Temporal proximity on its own is sufficient to establish a causal connection only "in rare cases[.] *Id.* In those rare cases, employers "retaliate swiftly and immediately." *Id.* For example, in *Mickey*, the plaintiff was laid off the same day the employer learned of his EEOC charge. *Id.* As indicated above, in *Howington*, the span was only two days. The Sixth Circuit has found the gaps here insufficient. *See, e.g.*, *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) ("The mere fact that Cooper was discharged four months after filing a discrimination claim is insufficient to support an interference [sic] of retaliation."); *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006) (finding a four-month gap insufficient on its own).

Whether the timing of the asserted adverse actions is sufficient to infer a retaliatory motive also must be judged in light of the circumstances, which here renders the proximity even less convincing. Ms. Beccia was evaluated in June

knowledge of protected activity and an adverse employment action as sufficient evidence of causality" but only when the temporal proximity is "very close"). In any event, the span here is longer even than *Singfield*.

2022, at or toward the end of the school year, as she was every year. (*See* ECF No. 17-16.) The student was moved to Ms. Beccia's DK classroom in September 2022, at the start of the school year, when it was determined that his initial placement was not appropriate. Thus, even if a four-month gap is sufficient to create a jury question on causation in some cases, it is insufficient here. Ms. Beccia offers nothing more to satisfy the fourth prong of her prima facie case than the time span between her protected activity and the alleged adverse actions.

For these reasons, Ms. Beccia fails to present evidence to support her retaliation claim.

## IV. Conclusion

To summarize, Ms. Beccia fails to show that, after agreeing to provide her requested accommodations, the District failed to implement them. The District, therefore, is entitled to summary judgment on her disability discrimination claims under the ADA, PWDCRA, and Rehabilitation Act. Ms. Beccia also fails to show that she suffered an adverse action after engaging in protected activity of which the District was aware or a causal connection between that protected activity and any alleged adverse action.

Accordingly,

**IT IS ORDERED** that the District's motion for summary judgment (ECF

No. 16) is **GRANTED**.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: September 26, 2025